**Brantley Tyler RAYBURN, a minor, By and Through his mother and next friend Wendy Ann RAYBURN; and Brandon Geoffrey Rayburn, a minor, by and through his mother and next friend Wendy Ann Rayburn, Plaintiffs,**

v.

**Dora L. FARNESI, Debra Trent, Wylene S. Williams, Carol A. Maddox, Donna Ivey, Georgia Brown, Gloria Turner, Ellen Taylor, Margaret Raiden, Skip Hogue, Dee Hogue, and Jane Doe Nos. 1 and 2, Defendants.**

No. CIV.A. 3:97CV151–JTC.

United States District Court,
N.D. Georgia,
Newnan Division.

Nov. 2, 1999.

David Jewett Llewellyn, Seth A. Litman, Office of David J. Llewellyn, Conyers, GA, for Plaintiffs.

John C. Jones, Office of State Attorney General, Atlanta, GA, Jefferson James Davis, Davis & Davis, Decatur, GA, for Defendants.

## ORDER

CAMP, District Judge.

This case is before the Court on Defendants' Motion for Summary Judgment [# 27–1], Plaintiffs' Request for Oral Argument on Defendants' Motion for Summary Judgment [# 31–1], Defendants' Emergency Motion to Amend Answer [# 34–1], and Defendants' Emergency Motion to File Supplemental Brief [# 35–1].

### I. Background

Wendy Ann Rayburn is the mother of three children: Tyler, Brandon, and Cam-

eron.[1] On October 21, 1995, Dora Farnesi, a case worker with the Carroll County Department of Family and Children's Services ("DFACS"), removed the Rayburn children from the physical custody of their mother. At the time Ms. Farnesi removed the children from Ms. Rayburn's custody, Tyler was five years old, Brandon was ten years old, and Cameron was seven years old. Ms. Farnesi placed the children in overnight emergency care in the home of Gail Brooks.

On October 22, 1995, Ms. Farnesi placed the children in foster care with Dee and Skip Hogue. On October 26, 1995, Dee Hogue called DFACS and informed Donna Ivey, a services clerk at DFACS, that she wanted all three Rayburn children out of her home. Ms. Hogue indicated that the children, especially Cameron, disrupted her household and were hard to control. Ms. Ivey conveyed this message to Ms. Farnesi. Farnesi discussed the situation with Debra Trent, a Social Services Supervisor in charge of caseworkers, and Wylene Williams, the county director of DFACS. The three agreed to move Cameron out of the Hogue household. On October 27, 1995, DFACS transferred Cameron to another foster home.

Ms. Farnesi served as the caseworker for the Rayburn children. On November 8, 1995, Brandon Rayburn visited Ms. Farnesi's office. During this visit Brandon and Ms. Farnesi discussed Brandon's fights with Chrystal Fernander, another foster child in the Hogue home. Brandon also related to Ms. Farnesi that he wished to go home.

On November 9, 1995, Wendy Rayburn visited with her children in the presence of Farnesi at the DFACS office. At this meeting Ms. Rayburn observed a bruise on Brandon's arm. Ms. Rayburn asked Ms. Farnesi to look at the bruise. Ms. Rayburn vocalized concern about the bruise. Ms. Farnesi asked Brandon if the bruise resulted from being bitten by Chrystal Fernander, another foster child at the Hogue residence. Brandon agreed that the bite caused the bruise. At this visit, Brandon told Ms. Farnesi that he was being mistreated in the Hogue household. (Brandon Rayburn Dep., p. 12.) However, Brandon meant that Tom Anderson, another foster child at the Hogue residence, had been mean to him. (Id.)

After Ms. Rayburn's visit with her children, Ms. Farnesi spoke with Ms. Hogue about the bite mark. Ms. Hogue explained that Brandon and Chrystal had been playing roughly. Ms. Hogue stated that Chrystal bit Brandon when he refused to let her out of a headlock. Ms. Farnesi questioned Brandon and Chrystal separately, and both children confirmed this account.

On November 13, 1995, Ms. Rayburn called Debra Trent and told her that her children were being abused in the Hogue foster home. Ms. Rayburn relayed her observation about the bruise and bite mark on Brandon's upper arm, and she stated that Brandon was afraid to tell her how it happened. Ms. Rayburn also said that Brandon told her that Ms. Hogue threatened him that he would never see his mother again.

Ms. Trent referred Ms. Rayburn to Ruth Reid, an intake worker at DFACS. Ms. Rayburn made a referral to Ruth Reid on November 13. On November 14, Ellen Taylor, an investigator at DFACS, conducted an investigation into Ms. Rayburn's claims. Ms. Taylor interviewed separately Brandon, Tyler, Chrystal, Tom Anderson, David S. (another foster child), and Ms. Hogue about Ms. Rayburn's allegations. On November 15, Taylor reported the findings of her investigation to Ms. Trent. Taylor found that the allegations of physical abuse were unfounded and that other concerns raised in the referral were without merit. Specifically, Taylor concluded that the bite marks occurred as a result of a wrestling incident between Brandon and Chrystal.

1. Cameron Rayburn is not a party to the present case.

On November 15, 1995, DFACS held a panel review concerning the Rayburn children. Ms. Rayburn, Ms. Trent, Wylene Williams, Ms. Farnesi, and Becca Aanstoos, a private counselor retained by DFACS to work with Brandon, attended.[2] Brandon and Tyler did not attend. At this meeting Ms. Farnesi reported the bite mark episode to the panel.

On November 21, 1995, Ms. Rayburn came for a scheduled visit with her children at DFACS. Ms. Rayburn discovered that the visit had been rescheduled to the next day. Ms. Rayburn had not received any notification of the change from Ms. Farnesi. Ms. Farnesi was on vacation from November 20 through November 28. Ms. Rayburn spoke with Georgia Brown, the investigative supervisor at DFACS, and alleged that Ms. Hogue was abusing her children. Ms. Brown asked if Ms. Rayburn made a referral about the matter, and Ms. Rayburn responded that she had. Ms. Brown stated that the matter would be investigated.

On November 25, Margaret Raiden, the on-call caseworker, received and returned a telephone call from Ms. Hogue. Ms. Hogue informed Ms. Raiden that Brandon and Chrystal had ridden their bicycles from her home to Villa Rica. Chrystal Fernander testified that she and Brandon ran away to find someone to tell what was going on in the Hogue household. (Chrystal Fernander Dep., pp. 14–15.) However, Chrystal also stated that she never told anyone what was going on in the Hogue household. (Id. at 15.) Brandon also wanted to run away in order to tell his mother how he was being treated. (B. Rayburn Dep., p. 34.) When the children returned to the Hogue household, they were apologetic.

On November 25, Ms. Raiden also spoke with Ms. Rayburn. Ms. Rayburn indicated that she received a message from Brandon on the answering machine informing

her that he had ridden to Villa Rica with another foster child. Ms. Raiden informed Ms. Rayburn that Brandon was already back at his foster home. Ms. Rayburn demanded to speak with Brandon on the telephone. Ms. Raiden set up a three way conference call. During the phone conversation, Brandon became extremely upset and asked his mother not to tell people that he was not being treated well in the foster home. Raiden ended the conversation by stating that the purpose of the call was to let Ms. Rayburn know that Brandon was all right and not to get into what may or may not have been happening in the foster home. Ms. Raiden reported the incident to Ms. Farnesi and Ms. Trent.

On November 27, 1995, Ms. Taylor received a phone call from an upset Ms. Rayburn. Ms. Rayburn reported that the Hogues psychologically abused the foster children in the home. Ms. Rayburn related that Brandon had run away two days earlier. She stated that she had recorded the last visitation with her children. Ms. Rayburn alleged that her children had been told that they would not be allowed to see her again if they cried. Ms. Rayburn also stated for the first time that she had heard that sexual abuse occurred in the Hogue home.

Ms. Taylor tried to reassure Ms. Rayburn about the safety of the children. Ms. Taylor told Ms. Rayburn about the interviews she conducted with the children on November 14. Ms. Taylor related that neither Brandon nor Tyler expressed any fear of the Hogues in her interviews with them. Ms. Taylor did not initiate another investigation because Ms. Rayburn could not provide any specifics as to her allegations of sexual abuse. Ms. Taylor felt that it was the same things she had investigated two weeks earlier. However, Ms. Taylor apprized Ms. Trent and Ms. Williams of her conversation with Ms. Rayburn.

---

2. Defendants claim that Brandon attended this meeting. For purposes of deciding this motion, the Court views the evidence in the light most favorable to Plaintiffs. Consequently, the Court assumes that Brandon did not attend this meeting.

When Ms. Farnesi returned from her vacation on November 29, she spoke by phone with Ms. Hogue about the bicycle incident on November 25. Ms. Hogue informed Ms. Farnesi that Brandon and Chrystal had ridden their bicycles to the home of Chrystal's mother and that Chrystal's mother returned them to the police.

On December 8, Ms. Rayburn attended a meeting at the DFACS office with Ms. Farnesi, Ms. Trent, and counselor Becca Aanstoos. The group discussed a number of things, including the bite mark incident and general claims of mistreatment.

Due to illness Ms. Farnesi was out of the office from December 18, 1995 until December 22, 1995. Ms. Farnesi was out of town from December 28, 1995, until January 9, 1996, due to a death in the family.

On December 24, 1995, Chrystal Fernander heard Tyler screaming in Tom Anderson's bedroom. Chrystal entered Tom's room and found Tyler and Tom in the same bed. Chrystal took Tyler out of bed and found that he was naked from the waist down. The next day Brandon told Chrystal that Tom had been molesting Tyler.

Brandon and Tyler went to tell Ms. Hogue about the incident, but Ms. Hogue told them that they were lying.[3] Chrystal also told Ms. Hogue that she saw Tyler and Tom in bed together and that Tyler did not have on shorts.

Tyler testified that Tom sexually molested him. Tyler also testified that Tom Anderson forced Candis Fernander, another foster child at the Hogues' home, to get in bed with Tyler on one occasion.

Ms. Rayburn met with her children in the presence of Ms. Ivey at DFACS on December 28, 1995. The children did not discuss the December 24 incident with their mother at that meeting. On January 2, 1996, Brandon and Tyler again visited with their mother at DFACS, and the three did not discuss the incident at that time.

On January 5, 1996, the juvenile court held a custody hearing. The judge awarded physical custody of the Rayburn children to Ms. Rayburn while legal custody remained with DFACS. The children returned home with their mother that day.

On January 10, 1996, Ms. Farnesi took Tyler to a local medical clinic. A staff member at the clinic observed Tyler briefly and stated that he had been sexually abused. On January 12, Tyler visited Scottish Rite Medical Center. Dr. Phillip Kelley, the attending physician, observed a yellow discharge from Tyler's anus. Dr. Kelley took a rectal culture. On January 17, 1996, Dr. Terez DeGrandi at Scottish Rite took a rectal culture from Brandon Rayburn. Both cultures tested positive for betahemolytic strep Group A.[4] Dr. DeGrandi opined that it is more probable than not that Tyler was sexually abused.

DFACS initiated an investigation into the possible sexual abuse of Tyler Rayburn. Susan Souligny, an investigator at DFACS, conducted the investigation. Ms. Souligny concluded that Tyler Rayburn had been sexually abused. Ms. Souligny also concluded that the time frame suggested that the abuse likely occurred while Tyler lived with the Hogues. However, Ms. Souligny stated that no evidence indicated that the Hogues were involved in the sexual abuse.

Plaintiffs filed the present civil rights action on October 20, 1997. Plaintiffs assert a section 1983 claim against Defendants. Count One of Plaintiffs' Complaint alleges that Defendants violated Plaintiffs' substantive due process rights under the Fifth and Fourteenth Amendments.[5] In

---

**3.** Defendants dispute this fact, but the Court construes the evidence in the light most favorable to Plaintiffs for purposes of a motion for summary judgment.

**4.** Betahemolytic strep Group A can be sexually transmitted.

**5.** Because the case does not involve federal government agencies or employees, the Fifth

Count Two, Plaintiffs maintain that Defendants violated Plaintiffs' procedural due process rights under the Fifth and Fourteenth Amendments.[6]

Plaintiffs' Complaint also contains three state law claims against Defendants Dee and Skip Hogue. Count Three of the Complaint alleges breach of contract. Count Four asserts a tort claim for negligent performance of the duty to protect. Count Five asks for damages for intentional tortious conduct.

Defendants move for summary judgment for all Defendants on all counts of Plaintiffs' Complaint.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant,' ... and draw 'all justifiable inferences ... in his favor ....'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991). The court may not weigh conflicting evidence nor make credibility determinations. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993), *rh'g denied*, 16 F.3d 1233 (1994)(en banc).

As a general rule, "[the] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party's responsibility varies depending upon which party bears the burden of proof at trial on the issue in question.

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Four Parcels*, 941 F.2d at 1437–38).

On the other hand, when the non-moving party bears the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. Instead, the moving party may simply point out to the district court that there is an absence of evidence to support the non-moving party's case on the issue in question. *Id.* at 1115–16. Of course, the moving party may offer evidence to affirmatively negate a material fact upon which the non-movant has the burden and which is essential to its claim. In either case, the non-moving party may not rely upon allegations or denials in the pleadings, but instead must respond with sufficient evidence to withstand a directed verdict motion at trial. Fed.R.Civ.P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.

Amendment is inapplicable in the present case. The Court analyzes Plaintiffs' due process claims under the Fourteenth Amendment.

**6.** *Id.*

1994) (citing *Fitzpatrick*, 2 .F.3d at 1116–17).

## III. Analysis

### A. State Law Claims

In 1991, the Georgia Constitution was amended to authorize the Georgia legislature to waive the State's long standing sovereign immunity defense to tort liability. *See* Georgia Const., Art. I, Sec. II, Para. IX; *Riddle v. Ashe*, 269 Ga. 65, 495 S.E.2d 287, 288 (1998). In addition, the constitutional amendment referred the issue of "official immunity" of state officials and employees to the legislature. Georgia Const. Art. I, Sec. II, Para. IX(a); *see also* R. Perry Sentell, Jr., *Tort Claims Against the State: Georgia's Compensation System*, 32 Ga. L.Rev. 1103, 1142 & n. 203 (1998). The Georgia Tort Claims Act, O.C.G.A. § 50–21–20 et seq., was subsequently enacted under the authority of the 1991 amendment. *Riddle*, 495 S.E.2d at 288.

■ The Georgia Tort Claims Act provides the "exclusive remedy" for any tort committed by a state officer or employee. O.C.G.A. § 50–21–25(a); *Riddle*, 495 S.E.2d at 288. The Act defines "state officers" and "employees" broadly to include: "elected or appointed officials, law enforcement officers, and persons acting on behalf or in service of the state in any official capacity, whether with or without compensation.... *An employee shall also include foster parents and foster children.*" O.C.G.A. § 50–21–22(7) (emphasis added). The Act expressly provides that such a state officer or employee who commits a tort while acting within the scope of his or her official duties or employment "*is not subject to lawsuit or liability therefor.*" O.C.G.A. § 50–21–25(a) (emphasis added). The provision does not afford "blanket immunity," however, and a state employee does not enjoy immunity from suit under the Act "if it is proved that the officer's or employee's conduct was not within the scope of his or her official duties or employment." *Id.* Whether a state employee is entitled to official immunity under the Georgia Tort Claims Act is a question of law to be decided by the Court. *Keenan v. Plouffe*, 267 Ga. 791, 482 S.E.2d 253, 255 n. 1 (1997).

■ In the present case, the Hogues served as foster parents for Tyler and Brandon Rayburn. The statute expressly states that foster parents are state employees under the Act. Therefore, the Georgia Tort Claims Act entitles the Hogues to official immunity against the state tort claims.[7]

Plaintiffs' argument that intentional injurious acts of state employees are outside the scope of their official duties for purposes of the Georgia Tort Claims Act is unsupported by the Act itself, as well as the case law interpreting the Act. First, the sovereign immunity provisions of the Georgia Tort Claims Act are instructive in analyzing Defendants' claim of immunity. The Act waives the sovereign immunity of the State of Georgia only "for the torts of its state officers and employees *while acting within the scope of their official duties or employment.*" O.C.G.A. § 50–21–23(a) (emphasis added). The Act provides that the State shall be liable for such torts "in the same manner as a private individual or entity" in like circumstances. *Id.* The legislature emphasized that "the state shall have no liability for losses resulting from conduct on the part of state officers and employees which was not within the scope of their official duties or employment." *Id.*

The Act then carves out exceptions to the State's broad waiver of sovereign immunity and provides that the State shall not be liable for losses resulting from certain enumerated actions even though taken within the course of state employees' official duties. O.C.G.A. § 50–21–24. In one

---

7. The Court notes that Plaintiffs sued the Hogues only in their individual capacities and not in their official capacities. Consequently, the State is not a party to the present suit.

provision, the Act excepts the torts of "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander or interference with contractual relations" from the waiver of sovereign immunity provided by the Act. O.C.G.A. § 50–21–24(7). If intentional actions could not be considered to be committed within the scope of a state employee's official duties as a matter of law, there would be no need to except such behavior from the State's waiver of sovereign immunity; there would be no waiver of that immunity in the first place. By creating a specific exception to the waiver of sovereign immunity for these intentional torts, the Act necessarily contemplates that state employees may commit intentional torts while acting within the scope of their official duties on behalf of the State.

Second, the case law interpreting the Act in Georgia is consistent with this interpretation. In *Mattox v. Bailey*, 221 Ga. App. 546, 472 S.E.2d 130 (1996), a prisoner at a state correctional facility sued a correctional officer and the Department of Corrections, alleging that the officer had "slammed plaintiff's head into a door and thereafter beaten him while escorting plaintiff across prison grounds." The trial court granted the officer's motion to dismiss, finding him immune from suit under the Georgia Tort Claims Act because his actions were taken in the course of his official duties for the State. *Id.*

In reviewing the dismissal, the Georgia Court of Appeals noted that such a "discretionary use of force" by the official could give rise to a "potentially valid cause of action under 42 U.S.C. § 1983." *Id.* at 131. The Court upheld the dismissal of the state law battery claim against the officer, however, finding that the officer was immune from suit under the Georgia Tort Claims Act where it was clear that the alleged battery arose from the performance of the officer's official duties as a state correctional officer in transporting the plaintiff across prison grounds. *Id.* Thus, the allegedly intentional nature of

the physical abuse of the plaintiff did not remove the conduct from the ambit of the Act. Therefore, both the provisions of the Georgia Tort Claims Act and the case law interpreting it demonstrate that the Act provides immunity from liability for torts committed during a state employee's performance of official duties without regard to intent or malice.

In this case, it is undisputed that the Hogues served as foster parents for Tyler and Brandon Rayburn. Plaintiffs argue that the Hogues acted outside the scope of their official duties. However, the Court believes that the Georgia State Tort Claims Act protects foster parents at all times. The duties and responsibilities of a foster parent are a constant responsibility. Everything that foster parents do regarding their foster children represents an action within the scope of their official duty. Consequently, the Court rejects Plaintiffs' argument that the Hogues acted outside the scope of their official duty. Because the undisputed evidence demonstrates that the Hogues acted within the scope of their official duties or employment with the State of Georgia while the alleged torts were committed, they are entitled to immunity under the Georgia Tort Claims Act and to summary judgment with respect to Plaintiffs' state law tort claims.

Plaintiffs assert a breach of contract claim against the Hogues in Count Three of the Complaint. Plaintiffs argue that the Hogues and DFACS entered a written contract that governed the terms and conditions for the provision of services as foster parents. Plaintiffs contend that they are intended third party beneficiaries to the contract. More specifically, Plaintiffs argue that the Hogues breached the contract by failing to provide proper care and protection for Plaintiffs. Consequently, Plaintiffs suffered damages as a result of this failure to comply with the contractual standard of care.

The Court finds that this breach of contract claim sounds in tort. Plaintiffs base their claim on the Hogues' failure to meet

a standard of care owed to Plaintiffs. The contract between the Hogues and DFACS does not create the duty of care owed to Plaintiffs. The duty of care owed to foster children by foster parents exists independently. The damages sought by Plaintiffs against the Hogues stem from their alleged breach of the duty of care owed to foster children. Consequently, the action sounds in tort rather than contract. As such, Count Three is subject to the provisions of the Georgia Tort Claims Act. Consequently, the Hogues are entitled to official immunity on Count Three. *See Burton v. DeKalb County*, 209 Ga.App. 638, 639, 434 S.E.2d 82 (1993).

■ As noted by the Georgia Court of Appeals in *Mattox*, this state law immunity in no way precludes a viable federal claim against the Hogues under 42 U.S.C. § 1983. Indeed, Plaintiffs' § 1983 claims against the Hogues remain pending before the Court.

Based upon the foregoing, Defendants' Motion for Summary Judgment with respect to Counts III, IV, and V of Plaintiffs' Complaint is **GRANTED**.

## B. Plaintiffs' Substantive Due Process Claims

■ "[A] child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir.1987)(footnote omitted), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989). "The liberty interests ... are the right to be free from the infliction of unnecessary pain, as that interest is protected by the fifth and fourteenth amendments, and the fundamental right to physical safety as protected by the fourteenth amendment." *Id.* at 794 (footnote omitted).

■ Incidental injuries or infrequent acts of abuse are not sufficient to establish section 1983 liability against state officials. *See id.* at 797. Plaintiffs must show that state officials were deliberately indifferent to the welfare of foster children in order for a court to impose liability:

> Defendants may be held liable under 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.

*Id.* (quoting *Doe v. New York City Dept. of Social Services,* 649 F.2d 134, 145 (2d Cir. 1981)). Plaintiffs must prove that Defendants possessed actual knowledge of the abuse or deliberately failed to learn what was occurring in the foster home. *Id.* at 796.

### 1. The Hogues

#### a. State Action

■ The Hogue Defendants argue in their supplemental brief to the motion for summary judgment that they are not state actors within the meaning of Section 1983. Section 1983 liability only applies to persons acting under color of state law. *See* 42 U.S.C. § 1983. Furthermore, the 14th Amendment addresses only state action: "Nor shall any State deprive any person of life, liberty, or property, without due process of law..." U.S. CONST. amend. XIV, § 1. Therefore, unless the injuries to plaintiffs were the result of state action, plaintiffs have no claim under Section 1983 for a violation of the 14th Amendment.

Plaintiffs argue that foster parents are state actors within the meaning of Section 1983. The mere fact, however, that the state closely regulates foster care does not by itself convert the actions of foster parents into state action. *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). In *Blum* the Court outlined a three part analysis to

1344

resolve the state action question. First, "[t]he complaining party must also show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). Second, a state will normally be held responsible for a private decision when "it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Id.* (citations omitted). "Third, the required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Id.* at 1005, 102 S.Ct. 2777, 457 U.S. 991, 102 S.Ct. at 2786 (quoting *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454). Although the state exercised no encouragement of the Hogues' actions, nor is foster care traditionally an exclusive state prerogative, the question remains under the first part of the *Blum* analysis, whether a sufficiently close nexus exists between the state and the regulated activity.

Defendants cite several cases in which other courts have found that the conduct of foster parents did not amount to state action for purposes of the Fourteenth Amendment. *See, e.g., Milburn v. Anne Arundel County DSS*, 871 F.2d 474, 479 (4th Cir.1989) (finding that foster parents were not state actors). However, the statutory scheme in those cases differs in one striking respect from the Georgia statutory scheme. The State of Georgia explicitly defines foster parents as employees of the state for the purposes of waiving sovereign immunity. O.C.G.A. § 50-21-22(7).

Under the Georgia Tort Claims Act, the state waives sovereign immunity for the torts of employees and officers committed within the scope of official duties or employment. O.C.G.A. § 50-21-23(a). In addition, the Act provides total immunity for employees who commit torts within the scope of employment. O.C.G.A. § 50-21-25(a). By including foster parents in the definition of state employees, the Act expressly grants foster parents this protection. *Id.* Likewise, the State expressly waives sovereign immunity and consents to suit for the torts of foster parents. The State's decision to waive sovereign immunity and consent to suit for the torts of foster parents, combined with the decision to provide total immunity to foster parents for torts committed during their employment as foster parents, creates a nexus between the State and the regulated activity of foster parents that is sufficient to make the Hogues state actors for purposes of the fourteenth amendment.[8]

**b. Jury Question as to Hogues**

Plaintiffs claim that the Hogues actually knew of the abuse of the Rayburn children. Tyler testified that Mr. Hogue whipped him on occasion.[9] (Tyler Rayburn Dep., p. 58-9.) Brandon testified that Tyler told the Hogues he was being abused by Tom Anderson. (B. Rayburn Dep., p. 40.) Brandon also stated that the Hogues threatened to split Tyler and Brandon up in different homes if they told how they were being mistreated. (*Id.* at 19, 35.) Tyler testified that "Ms. Dee told us if we—that if we tell our mom what happened in the foster home, she told us that she'd whip us with a belt and she cut out tongues off." (Tyler Rayburn Dep., p. 22.) Although Defendants dispute these allegations, the testimony of the children

8. In addition, Defendants admitted in their answer that at all pertinent times Defendants acted under color of state law. *See* Defs. Answer ¶ 14. Defendants filed an emergency motion to amend this answer on September 29, 1999. The Court addresses this motion *infra.*

9. The Court notes that the Hogues deny ever using corporal punishment. This dispute of fact raises a question for the jury on the issue of the Hogues' knowledge of physical abuse.

create a factual dispute about the actual knowledge of the Hogues.

Plaintiffs also claim that the Hogues observed the abuse of the Rayburn children. Brandon Rayburn testified that the Hogues witnessed Tom Anderson slamming Tyler on the ground and on the bed on different occasions. (B. Rayburn Dep., p. 25.) Chrystal Fernander testified that she told Ms. Hogue that Tyler was being sexually abused by Tom Anderson. (Chrystal Fernander Dep., p. 20.) Although the Hogues dispute ever learning of these allegations, the difference between the children's accounts and the recollections of the Hogues creates a jury question on the issue of the Hogues actual knowledge.

Considering all the facts presented, the Court finds that sufficient evidence exists to create a jury question on the issue of whether the Hogues had actual knowledge of the abuse of the Rayburn children.

### 2. Dora Farnesi

 Plaintiffs claim that Dora Farnesi exhibited deliberate indifference to the welfare of the Rayburn children in three ways. First, Plaintiffs argue that Farnesi knowingly placed the children in a foster home with a high risk of abuse. Second, Plaintiffs maintain that Farnesi ignored the signs of abuse. Finally, Plaintiffs allege that Farnesi did not properly investigate allegations of abuse. The Court will address each of these issues at length.

With respect to the first argument, Plaintiffs claim that Farnesi deliberately failed to tell the Hogues that Tom Anderson had possibly been sexually abused. Plaintiffs argue that this fact demonstrates Farnesi's deliberate willingness to place foster children in a situation with a high risk of sexual abuse. Plaintiffs' argument is not logical. Even assuming that Tom Anderson had been sexually abused, this fact does not mean that Farnesi knew or should know that Tom might be a risk to other children. At the point Tom Anderson came to live with the Hogues, all Farnesi could have known was

that Tom Anderson was possibly a *victim* of sexual abuse. Plaintiffs' evidence fails to establish that Farnesi knew that Tom Anderson posed a risk of sexual abuse to other foster children. Even if the Hogues were not informed about this matter, that fact does not demonstrate deliberate indifference on the part of Defendant Farnesi with regard to the welfare of the Rayburn children.

Plaintiffs also argue that Farnesi knew that the Hogues had a violent history, based upon the previous complaints against the Hogues. The first complaint was terminated as meritless because of the complainant's admission that she made the complaint at the urging of another child who did not like the Hogues. The second complaint was a third-hand allegation that Mr. Hogue attacked a foster child. An investigation proved that this assertion was unfounded, but the investigator expressed concern about an altercation between Mr. Hogue and his stepdaughter. DFACS required the Hogues to comply with a corrective action plan for preventing domestic violence. Plaintiffs fail to establish any additional facts that would suggest that the Hogues presented a high risk of abuse.

DFACS approved the Houges as foster parents in 1993. The Hogues cared for nearly thirty children during the course of their service. Prior to the placement of the Rayburn children in the Hogues' home, no evidence existed to suggest to Farnesi that the Hogues abused foster children or permitted the abuse of foster children. The Court finds that the evidence, viewed most favorably to Plaintiffs, is not sufficient for a reasonable jury to find that Defendant Farnesi exhibited deliberate indifference to the children's welfare by placing them in the Hogue home.

With respect to Plaintiffs' arguments that Farnesi deliberately ignored signs of abuse and failed to investigate abuse, the undisputed facts prove Plaintiffs' assertions to be false. The Rayburn children

remained in the Hogue home for a brief period of just over two months. Tyler and Brandon Rayburn stayed at the Hogue home from October 22, 1995 to January 5, 1996. On November 9, 1995, Ms. Farnesi learned of a bruise on Brandon's arm. Farnesi questioned Brandon and Ms. Hogue about this incident, and both told her the same thing; it happened after some rough horseplay between Chrystal and Brandon. In addition, DFACS conducted a full investigation into the incident on November 14, 1995. Ellen Taylor conducted the investigation, and she reported that the allegations of physical abuse were unfounded. In addition to this investigation, Farnesi met with Ms. Rayburn, Ms. Trent, and Ms. Aanstoos to discuss the bite mark/bruise episode. Plaintiffs fail to show how these events demonstrate Farnesi's deliberate indifference.

Plaintiffs produce no facts that demonstrate that Defendant Farnesi knew of any abuse in the Hogue household. It is undisputed that Farnesi had one in-home face to face visit with the children during their stay with the Hogues. Further, Plaintiffs produce no evidence that suggests that Farnesi deliberately failed to learn of any abuse in the Hogue household. Farnesi thoroughly discussed any concerns with Ms. Rayburn, and she followed up with Ms. Hogue and the children. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs fail to produce evidence sufficient for a reasonable jury to find that Ms. Farnesi exhibited deliberate indifference to the welfare of the children. Consequently, summary judgment for Defendant Farnesi is **GRANTED**.

### 3. Defendants Wylene Williams and Debra Trent

■ For a supervisor to be liable under Section 1983, liability must be based on something more than respondeat superior. *Braddy v. Florida Dept. of Labor & Employment Sec.*, 133 F.3d 797, 801 (11th Cir.1998). "Supervisory liability occurs ei-

ther when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990) (citations omitted), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

■ Defendant Debra Trent worked as a Social Services Supervisor at DFACS. In this position Trent supervised the caseworkers for Tom Anderson, as well as Tyler and Brandon Rayburn. Thus, Ms. Trent acted as Ms. Farnesi's supervisor.

Defendant Wylene Williams served as the county director of DFACS. As county director, Ms. Williams ultimately retained supervisory responsibility for all her employees. More specifically, Ms. Williams supervised both Ms. Trent and Ms. Farnesi.

Plaintiffs may establish section 1983 liability against Defendants Trent and Williams in two ways. First, Plaintiffs may establish liability by showing that the two Defendants had actual knowledge that the Rayburn children were being abused. Second, Plaintiffs may establish liability by showing that Defendants knew that Ms. Farnesi possessed actual knowledge that the Rayburn children were being abused.

The evidence in this case shows only that Ms. Rayburn called Ms. Trent on November 13, 1995 to complain that her children were being abused in the Hogue foster home. Ms. Trent referred her to intake worker Ruth Reid to make a referral. Ms. Rayburn made the referral, and DFACS conducted a full investigation into the allegations of abuse. The undisputed facts show that Defendants Trent and Williams acted with prudence and professionalism when dealing with Ms. Rayburn's allegations of child abuse. Plaintiffs offer no evidence to demonstrate that Ms. Trent or Ms. Williams had actual knowledge that the Rayburn children were being abused. Further, Plaintiffs present

no evidence to show that these Defendants knew that Ms. Farnesi had actual knowledge that the Rayburn children were being abused in the Hogue household.

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs fail to show that Defendants Trent and Williams were deliberately indifferent to the welfare of Plaintiffs. Further, Plaintiffs also fail to produce any evidence to establish supervisory liability under section 1983. Accordingly, the motion for summary judgment is **GRANTED** with respect to Defendants Williams and Trent.

### 4. Defendants Carol Maddox, Gloria Turner, Margaret Raiden, Donna Ivey, Ellen Taylor, and Georgia Brown

Plaintiffs concede that Defendants Carol Maddox and Gloria Turner did not participate in conduct resulting in a violation of Plaintiffs' constitutional rights. Consequently, summary judgment is **GRANTED** for Carol Maddox and Gloria Turner.

Margaret Raiden served as the on-call caseworker who handled communications when Brandon Rayburn biked away from the Hogues' home on November 25. Ms. Raiden did not have a duty to make an independent inquiry into the situation. She relayed the information to Ms. Trent and Ms. Farnesi. Raiden did not have any responsibility for monitoring the Rayburns' foster care nor any supervisory responsibility over those who did. Plaintiffs produce no evidence rebutting these facts. Consequently, summary judgment is **GRANTED** for Ms. Raiden.

Defendant Donna Ivey worked as a services clerk for DFACS. Her duties consisted of completing clerical work, monitoring natural parents' visitation sessions with their children at the DFACS office, and providing transportation for foster children and their parents. Her contacts with the Rayburns fell into those three categories. Ms. Ivey relayed any significant information she obtained regarding the Ray-

burns' needs to Ms. Farnesi. Ms. Ivey also referred Ms. Rayburn to Ms. Trent and Ms. Farnesi to lodge any complaints. Ms. Ivey possessed no authority to make decisions regarding foster care. Plaintiffs produce no evidence rebutting these facts. Consequently, summary judgment is **GRANTED** for Ms. Ivey.

Defendant Ellen Taylor served as an investigator for DFACS. She investigated a complaint by Wendy Rayburn about her children's treatment in November 1995. The subjects of the investigation included the mother's allegations about bite marks on Brandon Rayburn's arm, inadequate Halloween candy, and missing clothing. Ms. Taylor reported the results of her investigation to her superiors. She had no responsibility for the Rayburns' foster care, and she had no supervisory responsibility. Plaintiffs offer no evidence to rebut these facts. Consequently, summary judgment for Ms. Taylor is **GRANTED**.

Georgia Brown worked as a supervisor, but she had no significant connection with the Rayburn children while they were in foster care. At one point Ms. Brown spoke with Ms. Rayburn who was complaining about the treatment of her children in the foster home. Ms. Rayburn informed Ms. Brown that she had already made a referral on these complaints to the agency. Brown had no contact with the foster children at the Hogues' residence, and she heard no complaints about the Hogue home. Plaintiffs offer no evidence to rebut these facts. Consequently, summary judgment for Ms. Brown is **GRANTED**.

Plaintiffs offer no evidence about the involvement of Jane Does No. 1 and 2. Consequently, summary judgment for Jane Does No. 1 and 2 is **GRANTED**.

### 5. Qualified Immunity

In addition to denying substantive liability, Defendants assert that they are protected from liability based on the doctrine of qualified immunity. The Court now

**1348**

considers whether qualified immunity pro-tects Defendants Dee and Skip Hogue from Plaintiffs' substantive due process claims.

 "Qualified immunity protects government officials performing discre-tionary functions from civil trials... and from liability if their conduct violates no clearly established statutory or constitu-tional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994)(en banc)(internal quotations and citations omitted). For qualified immunity to be overcome, "pre-existing law must dictate, that is, truly compel (not just sug-gest or allow or raise a question about), the conclusion for every like-situated, rea-sonable government agent that what de-fendant is doing violates federal law *in the circumstances.*" *Id.* at 1150. Thus in or-der to defeat the Hogues' assertion of qualified immunity, Plaintiffs must first es-tablish that a violation of a federal right occurred, and Plaintiff must point to pre-existing law that compels the conclusion that a reasonable state actor would know that such conduct violated a federal right.

 In this case, the Court finds that the Hogues are not entitled to qualified immunity as to Plaintiffs' substantive due process claim. In *Taylor* the Eleventh Circuit clearly established that deliberate indifference to the welfare of a foster child is actionable under 42 U.S.C. § 1983. *See* 818 F.2d at 795-6. *Accord Miracle by Miracle v. Spooner,* 978 F.Supp. 1161, 1174 (N.D.Ga.1997)(Thrash, J.)(holding that *Taylor* clearly established that delib-erate indifference to a foster child's wel-fare violated the child's fourteenth amend-ment rights). The defense of qualified immunity does not apply if a jury finds that the Hogues were deliberately indiffer-

ent to Plaintiffs' welfare. *See Miracle,* 978 F.Supp. at 1174. If the facts are as Plain-tiffs argue, qualified immunity does not protect the Hogues against Plaintiffs' sub-stantive due process claim. Consequently, Skip and Dee Hogue's motion for sum-mary judgment on the substantive due process claim is **DENIED**.

**C. Plaintiffs' Procedural Due Pro-cess Claim**

"In procedural due process claims, the deprivation by state action of a constitu-tionally protected interest in 'life, liberty, or property' is not in itself unconstitution-al; what is unconstitutional is the depriva-tion of such an interest *without due pro-cess of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citations omitted).

Plaintiffs argue that Georgia's child care statutory scheme creates a vested claim of entitlement.[10] *See Taylor,* 818 F.2d at 800 ("We hold that the Georgia child care stat-utory scheme gives rise to a *Roth*-type claim.")(footnote omitted). Plaintiffs do not challenge the adequacy of Georgia's child care statutory scheme. Rather, Plaintiffs argue that Defendants deprived them of their vested entitlement by not following the procedures and mandates of the statutory scheme.

Plaintiffs fail to state the specific stat-utes and procedures that Defendants failed to follow. Plaintiffs produced no evidence demonstrating that specific Defendants failed to follow the statutory procedures. Instead, Plaintiffs broadly allege that De-fendants failed to comply with the statuto-ry scheme. Without specific evidence that points out violations of the statutory scheme, Plaintiffs can not survive a motion for summary judgment.

As such, the availability of procedural protec-tion is irrelevant; "no amount of process can justify its infringement." *McKinney v. Pate,* 20 F.3d 1550, 1557 (11th Cir.1994). Howev-er, precedent indicates that this fact situation may state a procedural due process claim.

---

**10.** The Court notes that the deprivation al-leged in this case is a striking example of a substantive due process violation: a funda-mental right that is "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' procedural due process claim.

### D. Defendants' Emergency Motion to Amend Answer

 Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend his pleadings once as a matter of course prior to the filing of a responsive pleading by the opposing party. Otherwise, a party may amend a pleading only by leave of court or by written consent of the adverse party. Plaintiffs oppose the amendment of Defendants' answer, and responsive pleadings have been filed in the case long ago. Accordingly, Defendants may only amend with leave of the Court. Rule 15(a) vests a district court with discretion in deciding whether to permit an amendment. *Campbell v. Emory Clinic,* 166 F.3d 1157, 1162 (11th Cir.1999). Rule 15(a) provides, however, that leave to amend a party's pleading "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). In discussing the scope of a court's authority in determining whether to permit an amendment, the Supreme Court has explained that:

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Technical Resource Serv., Inc. v. Dornier Medical Sys., Inc.,* 134 F.3d 1458, 1463 (11th Cir.1998); *Jameson v. Arrow Co.,* 75 F.3d 1528, 1534–35(11th Cir.1996). Therefore, a district court does not abuse its discretion in denying a motion to amend "when the amendment would prejudice the defendant, follows undue delays, or is futile." *Campbell,* 166 F.3d at 1162.

In this case, the Court finds that substantial reasons exist for denying Defendants' motion to amend their answer. First, the Court finds that Defendants' delay in moving to amend its answer is undue. Defendants have known the facts and legal theories involved in this case for some time. Defendants moved for summary judgment on June 1, 1999. The Court rejects Defendants' contention that enough time was not available to research the issue of state action. Both parties have fully briefed Defendants' motion for summary judgment. In light of the fact that the case is on the Court's trial calendar commencing on November 8, 1999, Defendants do not persuade the Court that they did not have time to amend their answer prior to September 29, 1999.

In addition, the Court finds that allowing Defendants to amend their answer would be futile. Simply asserting in the answer that the Hogues were not acting under color of state law will not resolve the issue of state action. The Georgia Tort Claims Act clearly provides that foster parents are state employees. Changing Defendants' answer about the Hogues acting under color of state law will not change the Court's analysis of the state action question. Consequently, Defendants' Motion to Amend Answer [# 34–1] is **DENIED.**

### IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment [# 27–1] is **GRANTED in part** and **DENIED in part**. Defendants' Motion for Summary Judgment [# 27–1] is **GRANTED** with respect to Counts II, III, IV, and V of the Complaint. Defendants' Motion for Summary Judgment [# 27–1] on Count I (the substantive due process claim) of the Complaint is **GRANTED** with respect to Dora L. Farnesi, Debra Trent, Wylene S. Williams, Carol A. Maddox, Donna Ivey, Georgia Brown, Gloria Turner, Ellen Taylor, Margaret Raiden, Jane Doe No. 1, and

**1350**

Jane Doe No. 2. The Clerk is **DIRECTED** to enter judgment accordingly.

Defendants' Motion for Summary Judgment [# 27–1] on Count I of the Complaint is **DENIED** with respect to Defendants Skip Hogue and Dee Hogue. The parties are **INSTRUCTED** to file the Pretrial Order within 10 days after the date of entry of this order.

Plaintiffs' Request for Oral Argument on Summary Judgment [# 31–1] is **DENIED**. Defendants' Emergency Motion to Amend Answer [# 34–1] is **DENIED**. Defendants' Emergency Motion to File Supplemental Brief [# 35–1] is **GRANTED**.