Brantley Tyler RAYBURN, a minor, by and through his mother and next friend Wendy Anny RAYBURN;  Brandon Geoffrey Rayburn, a minor, by and through his mother and next friend Wendy Anny Rayburn, Plaintiffs-Appellees,

v.

Skip HOGUE, Dee Hogue, Defendants-Appellants.

No. 99-14729.

United States Court of Appeals,

Eleventh Circuit.

Feb. 16, 2001.

Appeal from the United States District Court for the Northern District of Georgia.(No. 97-00151-CV-JTC-3), Jack T. Camp, Judge.

Before DUBINA, FAY and COX, Circuit Judges.

DUBINA, Circuit Judge:

This case involves an interlocutory appeal of the district court's order denying summary judgment to Skip and Dee Hogue ("the Hogues" or "the foster parents") who were alleged to have violated the constitutional rights of two of their foster children.  We reverse.

I. *BACKGROUND*[1]

A.    *Facts*

Wendy Ann Rayburn is the mother of three children:  Tyler, Brandon, and Cameron.[2]  On October 21, 1995, Dora Farnesi, a case worker with the Carroll County Department of Family and Children's Services ("DFACS"), removed the Rayburn children from the physical custody of their mother, Ms. Rayburn.  The removal occurred after the juvenile court in Carroll County, Georgia, entered an order finding the Rayburn children to be deprived and granting their temporary legal custody to DFACS.[3]  At the time Ms. Farnesi

---

[1]For the purposes of this appeal, we accept the district court's determination of the facts and recite those facts as set forth in the district court's order, supplementing them with additional evidentiary findings of our own from the record where necessary.  *See Cottrell v. Caldwell,* 85 F.3d 1480, 1486 (11th Cir.1996);  *see also Johnson v. Jones,* 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ("[T]he court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment.").

[2]Cameron Rayburn is not a party to the present case.

[3]DFACS is a branch of the Georgia Department of Human Resources ("DHR"), which is a State agency that, through its own programs and those of County Departments of Family and Children's Services, is authorized to provide deprived children with boarding care, or payment of maintenance costs in foster family homes.  O.C.G.A. § 49-5-8(a)(2)(E).  DHR is also empowered to contract with private

removed the children from Ms. Rayburn's custody, Tyler was five years old, Brandon was ten years old, and Cameron was seven years old. Ms. Farnesi placed the children in overnight emergency care in the home of Gail Brooks.

On October 22, 1995, Ms. Farnesi placed the children in foster care with Dee and Skip Hogue.[4] On October 26, 1995, Dee Hogue called DFACS and informed Donna Ivey, a services clerk at DFACS, that she wanted all three Rayburn children out of her home. Ms. Hogue indicated that the children, especially Cameron, disrupted her household and were hard to control. Ms. Ivey conveyed this message to Ms. Farnesi. Ms. Farnesi discussed the situation with Debra Trent, a Social Services Supervisor in charge of caseworkers, and Wylene Williams, the county director of DFACS. The three agreed to move Cameron out of the Hogue household. On October 27, 1995, DFACS transferred Cameron to another foster home.

Ms. Farnesi served as the caseworker for the Rayburn children. On November 8, 1995, Brandon Rayburn visited Ms. Farnesi's office. During this visit Brandon and Ms. Farnesi discussed Brandon's fights with Chrystal Fernander, another foster child in the Hogue home. Brandon also related to Ms. Farnesi that he wished to go home.

On November 9, 1995, Wendy Rayburn visited with her children in the presence of Ms. Farnesi at the DFACS office. At this meeting Ms. Rayburn observed a bruise on Brandon's arm. Ms. Rayburn vocalized concern about the bruise and asked Ms. Farnesi to look at it. Ms. Farnesi asked Brandon if the bruise resulted from being bitten by Chrystal Fernander, another foster child at the Hogue residence. Brandon agreed that the bite caused the bruise. During this visit, Brandon told Ms. Farnesi that he was being mistreated in the Hogue household. It later became evident, however, that Brandon meant that Tom Anderson, another foster child at the Hogue residence, had been mean to him.

After Ms. Rayburn's visit with her children, Ms. Farnesi spoke with Ms. Hogue about the bite mark.

_____

agencies, individuals, and other governmental agencies to provide child-protection services. O.C.G.A. § 49-5-16(a)(1). Furthermore, DHR has the power to license and regulate foster family homes and child-care facilities. O.C.G.A. §§ 49-5-8(a)(6), 49-5-12(j)-(k).

[4]The Hogues have been foster parents since December 21, 1993, when they contracted with DFACS. In their contract, the Hogues agreed to provide care to the children placed with them and to do so in accordance with DFACS general policy guidelines. These guidelines prohibited "spanking, shaking and all other forms of physical punishment." Additionally, the guidelines required the Hogues to take all reasonable precautions to protect the children "from unsafe or unsanitary living conditions and physical, mental, emotional, or sexual abuse." In return, DFACS agreed to pay the Hogues a per diem rate for the maintenance and support of the children, to furnish necessaries for the children, and to provide "general supervision, information, and assistance" related to the children's welfare.

Ms. Hogue explained that Brandon and Chrystal had been playing roughly. Ms. Hogue stated that Chrystal bit Brandon when he refused to let her out of a headlock. Ms. Farnesi questioned Brandon and Chrystal separately, and both children confirmed this account.

On November 13, 1995, Ms. Rayburn called Debra Trent and told her that her children were being abused in the Hogue foster home. Ms. Rayburn relayed her observation about the bruise and bite mark on Brandon's upper arm, and she stated that Brandon was afraid to tell her how it happened. Ms. Rayburn also said that Brandon told her that Ms. Hogue threatened that he would never see his mother again.

Ms. Trent referred Ms. Rayburn to Ruth Reid, an intake worker at DFACS. Ms. Rayburn made a referral to Ruth Reid on November 13. On November 14, Ellen Taylor, an investigator at DFACS, conducted an investigation into Ms. Rayburn's claims. Ms. Taylor interviewed separately Brandon, Tyler, Chrystal, Tom Anderson, David S. (another foster child), and Ms. Hogue about Ms. Rayburn's allegations. On November 15, Taylor reported the findings of her investigation to Ms. Trent. Taylor found that the allegations of physical abuse were unfounded and that other concerns raised in the referral were without merit. Specifically, Taylor concluded that the bite marks occurred as a result of a wrestling incident between Brandon and Chrystal.

On November 15, 1995, DFACS held a panel review concerning the Rayburn children. Ms. Rayburn, Ms. Trent, Wylene Williams, Ms. Farnesi, and Becca Aanstoos, a private counselor retained by DFACS to work with Brandon, attended. Brandon and Tyler did not attend.[5] At this meeting Ms. Farnesi reported the bite mark episode to the panel.

On November 21, 1995, Ms. Rayburn came for a scheduled visit with her children at DFACS. Ms. Rayburn discovered that the visit had been rescheduled to the next day. Ms. Rayburn had not received any notification of the change from Ms. Farnesi. Ms. Farnesi was on vacation from November 20 through November 28. Ms. Rayburn spoke with Georgia Brown, the investigative supervisor at DFACS, and alleged that Ms. Hogue was abusing the Rayburn children. Ms. Brown asked if Ms. Rayburn made a referral about the matter, and Ms. Rayburn responded that she had. Ms. Brown stated that the matter would be investigated.

On November 25, Margaret Raiden, the on-call caseworker, received and returned a telephone call

---

[5]Defendants claim that Brandon attended this meeting. However, for purposes of deciding this appeal, we must view the evidence in light most favorable to Plaintiffs. *See Stanley v. City of Dalton, Ga.,* 219 F.3d 1280, 1287 (11th Cir.2000). Therefore, like the district court, we assume that Brandon did not attend this meeting.

from Ms. Hogue. Ms. Hogue informed Ms. Raiden that Brandon and Chrystal had ridden their bicycles from her home to the home of Chrystal's mother. Chrystal later testified that she and Brandon ran away to find someone to tell what was going on in the Hogue household. (Chrystal Fernander Dep., pp. 14-15.). Brandon testified that he also wanted to run away in order to tell his mother how he was being treated. (B. Rayburn Dep., p. 34.). When the children returned to the Hogue household, they were apologetic.

On November 25, Ms. Raiden also spoke with Ms. Rayburn. Ms. Rayburn indicated that she received a message from Brandon on the answering machine informing her that he had ridden to Villa Rica with another foster child. Ms. Raiden informed Ms. Rayburn that Brandon was already back at his foster home. Ms. Rayburn demanded to speak with Brandon on the telephone. Ms. Raiden set up a three way conference call. During the phone conversation, Brandon became extremely upset and asked his mother not to tell people that he was being mistreated in the foster home. Raiden ended the conversation by stating that the purpose of the call was to let Ms. Rayburn know that Brandon was all right and not to get into what may or may not have been happening in the foster home. Ms. Raiden reported the incident to Ms. Farnesi and Ms. Trent.

On November 27, 1995, Ms. Taylor received a phone call from an upset Ms. Rayburn. Ms. Rayburn reported that the Hogues psychologically abused the foster children in the home. Ms. Rayburn related that Brandon had run away two days earlier. She stated that she had recorded the last visitation with her children. Ms. Rayburn alleged that her children had been told that they would not be allowed to see her again if they cried. Ms. Rayburn also stated for the first time that she had heard that sexual abuse occurred in the Hogue home.

Ms. Taylor tried to reassure Ms. Rayburn about the safety of the children. Ms. Taylor told Ms. Rayburn about the interviews she conducted with the children on November 14. Ms. Taylor related that neither Brandon nor Tyler expressed any fear of the Hogues in her interviews with them. Ms. Taylor did not initiate another investigation because Ms. Rayburn could not provide any specifics as to her allegations of sexual abuse. While Ms. Taylor felt that it was the same things she had investigated two weeks earlier, she nevertheless apprized Ms. Trent and Ms. Williams of her conversation with Ms. Rayburn.

When Ms. Farnesi returned from her vacation on November 29, she spoke by phone with Ms. Hogue about the bicycle incident on November 25. Ms. Hogue informed Ms. Farnesi that Brandon and Chrystal had ridden their bicycles to the home of Chrystal's mother and that Chrystal's mother returned them to the police.

On December 8, Ms. Rayburn attended a meeting at the DFACS office with Ms. Farnesi, Ms. Trent, and counselor Becca Aanstoos. The group discussed a number of things, including the bite mark incident and

general claims of mistreatment.

Due to illness, Ms. Farnesi was out of the office from December 18, 1995, until December 22, 1995. Ms. Farnesi was out of town from December 28, 1995, until January 9, 1996, due to a death in the family.

On December 24, 1995, Chrystal Fernander heard Tyler screaming in Tom Anderson's bedroom. Chrystal entered Tom's room and found Tyler and Tom in the same bed. Chrystal took Tyler out of bed and found that he was naked from the waist down. The next day Brandon told Chrystal that Tom had been molesting Tyler.

Brandon and Tyler went to tell Ms. Hogue about the incident, but Ms. Hogue told them that they were lying.[6] Chrystal also told Ms. Hogue that she saw Tyler and Tom in bed together and that Tyler did not have on shorts.

Tyler later testified that Tom had sexually molested him. Tyler also testified that Tom Anderson forced Candis Fernander, another foster child at the Hogues' home, to get in bed with Tyler on one occasion.

Ms. Rayburn met with her children in the presence of Ms. Ivey at the DFACS office on December 28, 1995. The children did not discuss the December 24 incident with their mother at that meeting. On January 2, 1996, Brandon and Tyler again visited with their mother, and the three did not discuss the incident at that time.

On January 5, 1996, the juvenile court held a custody hearing. The judge awarded physical custody of the Rayburn children to Ms. Rayburn while legal custody remained with DFACS. The children returned home with their mother that day.

On January 10, 1996, Ms. Farnesi took Tyler to a local medical clinic. A staff member at the clinic observed Tyler briefly and stated that he had been sexually abused. On January 12, Tyler visited Scottish Rite Medical Center. Dr. Phillip Kelley, the attending physician, observed a yellow discharge from Tyler's anus. Dr. Kelley took a rectal culture. On January 17, 1996, Dr. Terez DeGrandi at Scottish Rite took a rectal culture from Brandon Rayburn. Both cultures tested positive for betahemolytic strep Group A.[7] Dr. DeGrandi opined that it is more probable than not that Tyler was sexually abused.

DFACS initiated an investigation into the possible sexual abuse of Tyler Rayburn. Susan Souligny,

---

[6]Defendants dispute this fact, but, like the district court, we must construe the evidence in light most favorable to Plaintiffs for purposes of this appeal. *See Stanley,* 219 F.3d at 1287.

[7]Betahemolytic strep Group A can be sexually transmitted.

an investigator at DFACS, conducted the investigation. Ms. Souligny concluded that Tyler Rayburn had been sexually abused. Ms. Souligny also concluded that the time frame suggested that the abuse likely occurred while Tyler lived with the Hogues. However, Ms. Souligny stated that no evidence indicated that the Hogues were involved in the sexual abuse.

B.    *Procedural History*

In October 1997, Tyler and Brandon commenced this lawsuit by and through their mother and next friend, Ms. Rayburn. The Rayburns named as Defendants nine officers and employees of the DFACS, along with two Jane Does and the Hogues. The Rayburns alleged that the Hogues physically and emotionally punished Tyler and Brandon and observed "most, if not all" of the abuse inflicted upon them by Tom Anderson. Additionally, they alleged that the DFACS employees failed to properly supervise and monitor their foster care. On the basis of these allegations, the Rayburns asserted in Count One of their complaint a claim under 42 U.S.C. § 1983 against all Defendants for violation of Tyler and Brandon's substantive due process rights under the Fifth and Fourteenth Amendments of the United States Constitution. In Count Two, the Rayburns asserted another § 1983 claim against all defendants for violation of procedural due process under the Fifth and Fourteenth Amendments. The remaining claims were based on State law and were asserted only against the Hogues. Count Three was a claim for the Hogues' alleged breach of contract with DFACS to provide foster care. In Count Four, the Rayburns asserted a negligence claim, and in Count Five they asserted a claim for intentional infliction of emotional distress, as well as assault and battery.

The Defendants responded by denying all allegations of wrongdoing and pleading the defenses of qualified immunity, State sovereign and official immunities, and failure to state a redressable claim. Additionally, the Hogues argued that they were not State actors for Fourteenth Amendment purposes, and even if they were, the federal law as to foster parents was not clearly established.[8] Based on these arguments, the Defendants moved for summary judgment on all counts.

The district court granted summary judgment to all Defendants on all counts, with the exception of the Fourteenth Amendment substantive due process claim against the Hogues. In denying summary judgment

---

[8]All Defendants, including the Hogues, initially pleaded that they were acting under color of State law during all relevant times. Subsequently, the Hogues filed a motion to amend this pleading to reflect their argument that they were not State actors. However, the district court denied this motion, reasoning, *inter alia,* that such an amendment would not change its analysis of the State action question. We agree that such an amendment would not affect the State action analysis; thus, we do not consider this matter on appeal.

on this claim, the court found that the Hogues were not entitled to qualified immunity because they were State actors, the law was clearly established as to foster parents, and there was a jury question on the issue of whether the Hogues had actual knowledge of the abuse of the Rayburn children. The Hogues then perfected this appeal.[9]

## II. *ISSUES*

(1)     Whether the Hogues are State actors for § 1983 purposes.

(2)     Whether the Hogues are entitled to qualified immunity.

## III. *JURISDICTION AND STANDARD OF REVIEW*

This court has jurisdiction to hear an interlocutory appeal from a district court's denial of summary judgment based on qualified immunity. *Suissa v. Fulton County, Ga.,* 74 F.3d 266, 269 (11th Cir.1996). The district court's denial of summary judgment is subject to *de novo* review, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving parties. *Ayres v. General Motors Corp.,* 234 F.3d 514, 520 (11th Cir.2000).

## IV. *DISCUSSION*

Because of the Hogues' status as private individuals contracting with a State agency, DFACS, we must determine whether, given the allegations and facts of this case, the Hogues could be liable under § 1983 before we consider the issue of qualified immunity. That is, we must first determine whether the Hogues are State actors because § 1983 only provides for claims to redress State action. *See* 42 U.S.C. § 1983; *see also Patrick v. Floyd Medical Center,* 201 F.3d 1313, 1315 (11th Cir.2000) ("To obtain relief under § 1983, [a party] must show that he [or she] was deprived of a federal right by a person acting under color of state law."). Should we conclude that there is no State action, we must dismiss the Rayburn's claim without reaching the qualified immunity issue. *See id.; see also Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 790 n. 13 (11th Cir.1992) ("Since § 1983 requires action 'under color of state law,' only government officials acting under color of state law may assert qualified immunity.").

"Only in rare circumstances can a private party be viewed as a '[S]tate actor' for section 1983 purposes." *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992). Indeed, to hold that private parties, such as the Hogues, are State actors, this court must conclude that one of the following three conditions is met:

---

[9]The Rayburns filed a cross-appeal of the district court's decision to grant summary judgment on all other claims. However, on July 21, 2000, this court dismissed the cross-appeal for lack of jurisdiction. *See Rayburn ex rel. Rayburn v. Farnesi,* No. 99-14729-EE (11th Cir. July 21, 2000).

(1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution

("State compulsion test");  (2) the private parties performed a public function that was traditionally the

exclusive prerogative of the State ("public function test");  or (3) "the State had so far insinuated itself into

a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]"

("nexus/joint action test"). *NBC, Inc. v. Communications Workers of America,* 860 F.2d 1022, 1026-27 (11th

Cir.1988).

The district court found that the first two conditions were not met because "the [S]tate exercised no

encouragement of the Hogues' actions, nor is foster care traditionally an exclusive [S]tate prerogative."  We

agree.  However, based on the reasoning set forth below, the district court reached a different conclusion with

respect to the third condition:

> Under the Georgia Tort Claims Act, the [S]tate waives sovereign immunity for the torts of employees and officers committed within the scope of official duties or employment.  O.C.G.A. § 50-21-23(a). In addition, the Act provides total immunity for employees who commit torts within the scope of employment.  O.C.G.A. § 50-21-25(a).  By including foster parents in the definition of [S]tate employees, the Act expressly grants foster parents this protection.  *Id.* Likewise, the State expressly waives sovereign immunity and consents to suit for the torts of foster parents.  The State's decision to waive sovereign immunity and consent to suit for the torts of foster parents, combined with the decision to provide total immunity to foster parents for torts committed during their employment as foster parents, creates a nexus between the State and the regulated activity of foster parents that is sufficient to make the Hogues [S]tate actors....

*Rayburn ex rel. Rayburn v. Farnesi,* 70 F.Supp.2d 1334, 1344 (N.D.Ga.1999).  We disagree with this

conclusion.

As stated, the relevant inquiry under the nexus/joint action test is whether "the State has so far

insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in

the enterprise." *NBC,* 860 F.2d at 1026-27.  "To charge a private party with [S]tate action under this standard,

the governmental body and private party must be intertwined in a 'symbiotic relationship.' "  *Id.* at 1027

(quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).  The

Supreme Court has indicated that the symbiotic relationship must involve the " 'specific conduct of which the

plaintiff complains.' "  *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 51, 119 S.Ct. 977, 143

L.Ed.2d 130 (1999) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982));

*see also NBC,* 860 F.2d at 1027 (noting that the "Supreme Court has suggested that the symbiotic relationship

must involve the alleged constitutional violation.").  Moreover, this court has recognized that

> "[i]f a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the [S]tate.  Rather, private conduct is fairly attributable only

when the [S]tate has had some affirmative role, albeit one of encouragement short of compulsion, *in the particular conduct underlying a claimant's civil rights grievance.*"

*NBC,* 860 F.2d at 1025 n. 4 (emphasis added) (quoting *Frazier v. Board of Trustees of Northwest Miss.,* 765 F.2d 1278, 1286, *modified on other grounds,* 777 F.2d 329 (5th Cir.1985)). Therefore, because the particular conduct at issue here is child abuse, we must determine whether the State was a "joint participant" with the Hogues in the context of child abuse.[10] *NBC,* 860 F.2d at 1027. The answer is "no."

While the State of Georgia does regulate foster parenting to an extent, and, thus, arguably has a symbiotic relationship with the Hogues, this relationship certainly does not encourage or sanction child abuse in any way. To the contrary, the State and DFACS specifically forbid such conduct. Moreover, the mere fact that a State regulates a private party is not sufficient to make that party a State actor. *See Blum,* 457 U.S. at 1004, 102 S.Ct. 2777; *American Mfrs. Mut. Ins.,* 526 U.S. at 57, 119 S.Ct. 977.

Likewise, the act of extending governmental tort liability and immunity rules to foster parents does not transform the Hogues into State actors. If that were the case, then even foster children would be considered State actors because the Georgia Torts Claim Act includes foster children in the definition of State employees. O.C.G.A. § 50-21-22(7). At most, the relationship between Georgia's extension of immunity to foster parents and the alleged child abuse of which the Rayburns complain is a tenuous one. *See generally Mitchell v. Forsyth,* 472 U.S. 511, 527-28, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("[I]mmunity is conceptually distinct from the merits of the plaintiff's claim that his [or her] rights have been violated."). Such a nebulous connection between the State and the alleged misconduct is not sufficient to establish State action. *See American Mfrs. Mut. Ins.,* 526 U.S. at 52, 119 S.Ct. 977 (holding that the question of whether "there is a sufficiently close nexus between the State and the challenged action of [a private party] ... depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State") (internal marks and citations omitted). Thus, while we are sympathetic to the Rayburns, assuming they could prove their cause of action,

---

[10]The Parties assert, and we agree, that this precise issue is one of first impression. Yet, we note that when addressing similar issues, other courts have generally refused to attribute the actions of foster parents to the State. *See Milburn v. Anne Arundel County Dept. of Social Services,* 871 F.2d 474, 479 (4th Cir.1989); *Lintz v. Skipski,* 807 F.Supp. 1299, 1306-7 (W.D.Mich., 1992) ("This Court is unaware of any case which has held that foster parents are [S]tate actors."), *aff'd,* 25 F.3d 304 (6th Cir.1994); *Pfoltzer v. County of Fairfax,* 775 F.Supp. 874, 891 (E.D.Va.1991), *aff'd,* 966 F.2d 1443 (4th Cir.1992); *see also K.H. v. Morgan,* 914 F.2d 846, 852 (7th Cir.1990) (assuming, without deciding, that "foster parents, even if paid by the [S]tate, are not state agents for constitutional purposes"); *but cf. Perez v. Sugarman,* 499 F.2d 761, 765-66 (2d Cir.1974) (conduct of private child-caring institutions acting on behalf of the City of New York was determined to be State action).

we simply cannot conclude that by extending the Georgia Torts Claim Act to foster parents, the State of Georgia became a "joint venturer[]" with the Hogues in effecting the particular conduct underlying the Rayburns' complaint. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *American Mfrs.,* 526 U.S. at 50-51, 119 S.Ct. 977; *NBC,* 860 F.2d at 1025 n. 4. Because the district court found State action solely on this basis,[11] we vacate that portion of the district court's order and remand this case for further proceedings consistent with this opinion.

       VACATED and REMANDED.

---

[11]Although the Rayburns advance other theories of State action, the district court did not address them.  Consequently, this court will refrain from considering these matters for the first time on appeal. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").